**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In re:                                   )
                                         )     Case No. 12-11149-BFK
WSG DULLES, L.P.                         )     Chapter 11
                                         )      (Jointly Administered)
                    Debtor               )


**MEMORANDUM OPINION**

This matter comes before the Court on the Motion of LBCMT 2007-C3 Sterling Retail,

LLC, to dismiss the bankruptcy cases of WSG Dulles, L.P., and WSG Dulles GL, LLC (Docket

No. 55); the Motion of LBCMT 2007-C3 Seminole Trail, LLC, to dismiss the WSG

Charlottesville, LLC, bankruptcy case (Docket No. 56); and the Motion of LBCMT 2007-C3

RHL Blvd. Limited Partnership, to dismiss the WSG Trace Fork L.P. bankruptcy case (Docket

No. 57).[1]  In the alternative, the movants seek relief from the automatic stay under Section

362(d)(2) of the Bankruptcy Code.

The four bankruptcy cases are being jointly administered.  They are not substantively

consolidated.  There are three properties at issue: Dulles Town Crossing, in Sterling, Virginia;[2]

Charlottesville Center, in Albemarle County, Virginia; and the Trace Fork shopping center, in

Charleston, West Virginia.  The Debtors filed Oppositions to the three Motions.  Docket Nos. 94,

95, 96.  The Court heard evidence from the parties on November 2 and 5, 2012.  Shortly before

the evidentiary hearing on the Motions to Dismiss, the Debtors filed a Plan of Reorganization.

Docket No. 97.  The Debtors have not filed a Disclosure Statement, and, as set out more fully

---

[1]  The LBCMT entities are referred to throughout this Opinion as the "Lenders."

[2]  WSG Dulles GL, LLC, or "Dulles GL," is the ground lessor to WSG Dulles, L.P.  Dulles GL leases the ground to
WSG Dulles, L.P., for nominal consideration.

below, the Debtors acknowledge that their Plan needs to be amended in order to gain

confirmation.  For the reasons stated below, the Court will grant the three Motions to Dismiss.

## Findings of Fact

Having heard the evidence and the arguments of the parties, the Court makes the

following findings of fact:

*A.  The Debtors' Properties*

1.      The Debtors share a common ownership structure, under the control of Eric

Sheppard and Robert Kalman.

2.      Each of the Debtors owns (or in the case of WSG Dulles, leases) a small strip-

shopping center, each with two or three nationally recognized retail tenants.  Mr. Sheppard's

business model is to figure out where big box retailers (Target, Kohl's, Best Buy) are going, to

buy properties in close proximity to their properties, and to lease his properties to nationally

recognized retail tenants.  The three shopping centers can be described as follows:

| Property | Rentable Square Feet | Tenants |
|---|---|---|
| Dulles | 9,000 sq. ft. | Men's Warehouse/ Vitamin Shoppe[3] |
| Charlottesville | 9,114 sq. ft. | Mattress Warehouse/ Game Stop[4] |
| Trace Fork | 8,597 sq. ft. | Men's Warehouse/ Casual Male[5] |

Debtors' Exs. C – E.

3.      Mr. Sheppard and Mr. Kalman have successfully developed numerous properties

throughout the country, using this model as their mode of development.

---

[3]  Men's Warehouse occupies 6,300 sq. ft.; Vitamin Shoppe occupies 2,700 sq. ft.  Vitamin Shoppe has just renewed its lease for an additional 10 years.

[4]  Mattress Warehouse occupies 4,500 sq. ft.; Game Stop occupies 1,500 sq. ft.  The balance of the property, roughly 3,000 sq. ft., is currently vacant.

[5]  Men's Warehouse occupies 5,177 sq. ft.; Casual Male occupies 3,420 sq. ft.

*B.  The Cross-Collateralization of the Guarantee Obligations*

4.      The three properties are part of a larger finance restructuring that took place in July 2007, with Lehman Brothers.  Since Lehman Brothers' demise, the debt has been sold.  It is being serviced by LNR Partners.

5.      There are seven WSG properties that are (or were) a part of this restructuring:

WSG Dulles

WSG Charlottesville

WSG Trace Fork

WSG Monroe

WSG Short Pump

WSG ATL 2130

WSG Snellville

6.      Three of the properties have been foreclosed: Monroe, Snellville and Short Pump. It is unclear how much, if any, in the way of deficiency claims can be asserted as a result of the foreclosures.

7.      WSG ATL 2130 is the subject of its own Chapter 11 proceeding in Atlanta.

8.      Each of the properties serves as cross-collateral with each of the other properties, for the overall finance transaction.  Each property secures a Primary Note and a Guarantee obligation for the other property obligations.  The parties have stipulated that the three properties have the following secured debt structures:

(a)  Dulles                    $3,280,000 Primary Note

                               $13,340,000 Guaranteed Debt

(b)  Charlottesville           $2,480,000 Primary Note

3

$14,140,000 Guaranteed Debt

(c)  Trace Fork                $2,160,000 Primary Note

$14,460,000 Guaranteed Debt

*C.  The Debtors' Pre-Petition Negotiations with the Lenders*

9.       The parties engaged in extensive negotiations over the course of approximately a year, before these bankruptcy cases were filed.  When the parties began their negotiations, they entered into detail Workout Letters for each of the properties, the import of which was: (a) there could be no deal until there was a final deal; (b) there would be no oral agreements; and (c) the Debtors had no right to rely on anything that was said during the negotiations, until a final deal was put to paper and signed.  Movants' Ex. 34.

10.       In April of 2011, Mr. Sheppard was successful in obtaining a Term Sheet from Ladder Capital, to refinance the debt, the effect of which would have been, if consummated, to take the Lenders out of the picture.  Debtors' Ex. Q.  In Mr. Sheppard's view, the Ladder Capital refinance would have paid the Lenders "in full"—that is, all of the Lenders' principal and interest.  The sticking point for Mr. Sheppard, though, was that each of the Notes contains an obligation to pay a substantial Prepayment Penalty, or Exit Fee.  Movants' Exs. 1 ($3,280,000 Promissory Note, ¶ 5), 2 ($2,160,000 Promissory Note, ¶ 5), & 3 ($2,480,000 Promissory Note, ¶ 5).  The Lenders insisted on payment of their Exit Fees in full; Mr. Sheppard steadfastly refused to pay the Exit Fees.  Notwithstanding this lack of agreement, Mr. Sheppard went forward with the Ladder refinancing, paying some $190,000 in due diligence costs.  Debtors' Ex. R.

11.       At the end of March or the beginning of April, 2011, Mr. Sheppard stopped paying the Lenders their debt service payments.  Rather than pay the debt service payments, Mr. Sheppard caused each of the Debtors to accumulate a substantial amount of cash.  Ultimately,

this accumulated cash was paid to a related company, WSG Management, for "monthly
management fees and intercompany transfers."  Movants' Exs. 7, 10 & 13 (WSG Dulles, WSG
Trace Fork and WSG Charlottesville Amended Statements of Financial Affairs, ¶ 3(c),
respectively).  The monthly management fees were roughly 4 to 5% of the total amounts paid to
WSG Management.

     12.    Mr. Sheppard acknowledged in his testimony, in response to the Court's
questions, that the developer fees were subordinate to the obligations payable to the Lenders.[6]  In
all, the following amounts were paid to WSG Management by the three Debtors:

|  |  |
|---|---|
| (a) WSG Dulles | $359,480.83 |
| (b) WSG Charlottesville | $133,493.44 |
| (c) WSG Trace Fork | $245,510.63 |
| TOTAL | $738,484.90 |

Movants' Exs. 7, 10 & 13 (WSG Dulles, WSG Trace Fork and WSG Charlottesville Amended
Statements of Financial Affairs, ¶ 3(c), respectively).  Not surprisingly, the Lenders expressed
their extreme displeasure at WSG's withholding of debt service payments, at one point refusing
to engage in further negotiations, and ultimately, noticing a number of the WSG properties for
foreclosure sales.  Movants' Ex. 35.

    *D.  Valuation of the Properties*

     13.    The Court heard the evidence of three appraisers, who testified for the Lenders, as
well as the testimony of Mr. Sheppard, as to the value of the three properties.  Mr. Sheppard is

---

[6]  Mr. Sheppard testified that he understood: "the first mortgage [meaning the Primary Note] comes first."  The
Lenders have filed a lawsuit against WSG Management for the return of these funds, claiming a conversion of their
collateral.  It is possible that the Lenders' claims against WSG Management are stayed (*see Nat'l Am. Ins. Co. v.
Ruppert Landscaping Co.,* 187 F.3d 439, 441 (4th Cir.1999)), a matter that need not be determined in light of the
Court's decision to grant the Motions to Dismiss.

extremely knowledgeable about the properties, and about the development of these types of

centers.  He is not, however, an expert on interest rates.  Accordingly, the Court did not allow

him to testify as to one crucial component of valuation of a commercial shopping center: the

discount rate to be used in determining the value of the centers based on a discounted cash flow

model.

14.     Two of the Lenders' appraisers made upward adjustments to their appraisals as a

result of recently available information.  Mr. Harvey testified that, with respect to the Dulles

property, he would increase his valuation by approximately $200,000 to $300,000 as a result of

the renewal of the Vitamin Shoppe lease (which is roughly 30% of the leased space).  Mr.

McCoy testified that, with respect to the Trace Fork property, he would adjust his appraisal

upward in the amount of some $300,000 as a result of the renewal of the Casual Male lease.

15.     Mr. Sheppard testified that he would value each of the properties at a higher

valuation—Dulles, $4.0 million to $4.5 million; Charlottesville, $2.75 million to $2.80 million;

and Trace Fork, $3.0 million.  However, Mr. Sheppard was qualified as an expert in commercial

real estate development, but as noted, he was not qualified as an expert in real estate valuation,

which prevented him from providing admissible valuation testimony based on a discounted cash

flow (or DCF) model, because he could not testify as to the appropriate discount rates.

16.     The differences between the three appraisers' conclusions as to value, and Mr.

Sheppard's view of value, is insignificant in the overall scheme, because of the cross-

collateralization of the Guarantee obligations.  Further, as discussed below, Mr. Sheppard did not

provide the Court with an enterprise valuation, so the Court is unable to conclude that there is

equity in any of the three subject properties.

17.     For purposes hereof, the Court accepts the Lenders' appraised values, after the

foregoing adjustments.  The Court finds that the properties have the following values:

Dulles                  $3,700,000

Charlottesville         $2,000,000

Trace Fork              $1,720,000 ("As Is")/ $1,960,000 ("Stabilized")

18.     Other than the secured indebtedness, the unsecured debts in each of the cases are

modest.  Putting aside the proofs of claim filed by Joel L. Tabas, Chapter 7 Trustee of the

bankruptcy estate of Capital Investments, USA,[7] the unsecured debts total:

WSG Dulles              $11,442.91

WSG Charlottesville     $14,734.64

WSG Trace Fork          $12,042.79

19.     With respect to the foreclosed properties, it is not possible to tell how much, if

any, the deficiency claims may be.  The Debtors assert that, with respect to Snellville, the

Superior Court of Gwinnett County, Georgia, has found that the property "did not bring its true

market value" at the foreclosure sale.  Debtors' Ex. B, p. 2.  As a result, the Superior Court

ordered that: (a) the Application for approval of the foreclosure sale was "Refused;" and (b) the

Lenders' request for a resale of the property was "Refused."   The parties disagree as to the

meaning of this ruling.  The Debtors assert that it means there will be no deficiency claim arising

out of the Snellville foreclosure sale.  The Lenders assert that the deficiency claim remains,

notwithstanding the Superior Court's refusal to confirm the foreclosure sale.

---

[7]  Mr. Sheppard testified that he has settled with Mr. Tabas and he expects the Tabas proofs of claim to be
withdrawn in each of the cases.  Mr. Sheppard testified that he has agreed to pay the Trustee $700,000, of which he
paid the first $200,000 on or about October 5, 2012.

E.   *The Debtors' Bankruptcy Cases*

20.     The Debtors filed their voluntary petitions under Chapter 11 in this Court on

February 23, 2012.

21.     In their initial filings, the Debtors did not disclose the payment of the

management fees and developer fees to WSG Management.  *See* Movants' Exs. 5, 9 & 12 (WSG

Dulles, WSG Trace Fork and WSG Charlottesville Statements of Financial Affairs, ¶ 3(c),

respectively).[8]  It was not until after the first meetings of creditors that the Debtors amended their

Statements of Financial Affairs, and the payments were disclosed to the Court and the creditors.

Movants' Exs. 7, 10 & 13 (WSG Dulles, WSG Trace Fork and WSG Charlottesville Amended

Statements of Financial Affairs, ¶ 3(c), respectively).

22.     During the course of the cases, the Debtors and the Lenders have entered into

agreed Cash Collateral Orders, calling for the payment of expenses as well as debt service on a

monthly basis.  Movants' Exs. 14, 15 & 16.

23.     On October 26, 2012, the Debtors filed a Plan of Reorganization in these jointly

administered cases.  Docket No. 97.  The Plan, discussed below, calls for an "Initial Equity

Infusion," as well as a "Subsequent Equity Infusion" into the Debtor entities.

24.     Subsequent to the hearing in this Court, the Debtors submitted a Supplemental

Memorandum.  Supplemental Mem., Docket No. 111.  In their Supplemental Memorandum, the

Debtors argue that a defect in the Lenders' notices of default renders the acceleration of each of

the debts null and void.  The Debtors assert: "The resolution of these matters go to the very heart

of these Bankruptcy Cases – the validity and amount of the LBCMT claims, the amount of the

---

[8] In Movant's Exhibit 12, WSG Charlottesville disclosed intercompany transfers and management fees to WSG
Development but did not include a specific amount.

equity in the properties, the effect of the cross-default provisions, and the Debtors' ability to

propose a confirmable plan of reorganization. Until these issues can be resolved, these cases

deserve to stay in bankruptcy." Supplemental Mem., p. 13. The Lenders disagree, arguing that:

(a) a notice of default for a payment default was unnecessary under the loan documents; and (b)

in any event, the debts were accelerated when the Debtors filed their Chapter 11 petitions.

**Conclusions of Law**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of

Reference of the U.S. District Court for this District of August 15, 1984. This is a core

proceeding, within the meaning of 28 U.S.C. § 157(b)(2)(A) (matters concerning the

administration of the estate), and (G) (motions to terminate, annul or modify the automatic stay).

Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

**I.       The Lenders' Motions to Dismiss**

The Fourth Circuit has held that, in order to dismiss a Chapter 11 case, there must be a

showing of both: (a) subjective bad faith; and (b) objective futility. *Carolin Corp. v. Miller*, 886

F.2d 693, 700-02 (4th Cir. 1989); *see also Rollex Corp. v. Associated Materials, Inc. (In re*

*Superior Siding & Window, Inc*.), 14 F.3d 240, 242 (4th Cir. 1994). It noted that "though

separate inquiries into each are required, proof inevitably will overlap. Evidence of subjective

bad faith in filing may tend to prove objective futility, and vice versa." *Carolin Corp.,* 886 F.2d

at 701.

The Fourth Circuit also noted the possibility that "in a given case proof of the objective

futility of a proposed reorganization might be so overwhelming that it would support a parallel

finding of subjective bad faith despite the lack of any other evidence more directly probative of

the petitioner's motive." *Carolin Corp.,* 886 F.2d at n.3.

9

Section 1112(b)(1) of the Bankruptcy Code provides:

Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

Subsection (b)(4) of Section 1112 defines the term "cause" to include:

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
(B) gross mismanagement of the estate;
(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
(E) failure to comply with an order of the court;
(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
(K) failure to pay any fees or charges required under chapter 123 of title 28;
(L) revocation of an order of confirmation under section 1144;
(M) inability to effectuate substantial consummation of a confirmed plan;
(N) material default by the debtor with respect to a confirmed plan;
(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

The term "includes" is not limiting. 11 U.S.C. § 102(3). "The court will be able to

consider other factors as they arise, and to use its equitable powers to reach an appropriate result

in individual cases." *Carolin Corp.*, 886 F.2d at 699 (quoting H.R. Rep. No. 595, 95th Cong., 2d

Sess. 406, reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6362).  The Court will address both

prongs of the two part *Carolin Corp.* test, in turn.

### A.  Subjective Bad Faith

The inquiry on subjective bad faith "is designed to insure that the petitioner actually

intends to use the provisions of Chapter 11 . . . to reorganize or rehabilitate an existing

enterprise, or to preserve going concern values of a viable or existing business." *Carolin Corp.*,

886 F.2d, at 702 (quoting *In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr. C.D. Cal. 1981)

(*Victory I*).  Its aim is to "determine whether the petitioner's real motivation is 'to abuse the

reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11

device merely for the purpose of invoking the automatic stay, without an intent or ability to

reorganize his financial activities.'" *Id.* (quoting *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505

(B.A.P. 9th Cir. 1983)).

The Lenders point to a number of pre-petition acts or omissions on the part of the Debtors

that, taken individually or collectively, are not meaningful in the context of a subjective bad faith

inquiry.  The Lenders argue that the Debtors let their Virginia certificates of partnership or their

limited liability company certificates lapse, pre-petition.  This can only be described as a clerical

error, without significance in this context.  The Lenders argue that the Debtors filed their

bankruptcy cases "on the eve of a foreclosure sale."  This is not evidence of bad faith.  Rather,

the Debtors filed their petitions in a timely way, before the foreclosure sales were effected.  In

fact, "eve of foreclosure" filings are quite common in both commercial and consumer cases.

Such filings do not, by themselves, evidence bad faith on the part of the Debtors.  The Lenders

further argue that these cases are "essentially two party disputes."  This is disputed by the

Debtors who argue that, given the nature of the financings, these are multiple party disputes.

However, this too is not unusual.  The Court views the single asset case amendments to the

Bankruptcy Code enacted as a part of the 1994 Amendments, as a response to the "two party

dispute" argument, at least in the context of commercial real estate.[9]

There are, however, far more serious and indisputable facts that lead the Court to the

conclusion that these cases were filed in bad faith.  The Debtors stopped paying the secured debt

in March or April 2011.  Rather than escrow these funds, or set them aside in some way, the

Debtors made a decision to up-stream them to WSG Management.  The diverted monies totaled

$738,484.90.  The secured lenders inarguably had a lien on these funds.  Mr. Sheppard

acknowledged in his testimony that the primary liens were entitled to payment before the

developer fees, which would have constituted some 95 to 96% of the funds (the other 4 to 5%

being management fees).  The withholding of a secured lender's collateral in a substantial

amount (here, over $700,000), and the payment of those funds to an insider management

company for other than ordinary and necessary operating expenses such as management fees, is

the very definition of bad faith in the context of a commercial real estate loan workout.

Further, the Debtors concealed the diversion of the funds in their initial filings with the

Court.  Each of the three Debtors—WSG Dulles, WSG Charlottesville and WSG Trace

Fork—filed Statements of Financial Affairs that did not disclose the payment of these amounts to

WSG Management.  It was not until after the first meetings of creditors that the Debtors

amended their Statements of Financial Affairs to disclose the payments to WSG Management.

The Court might be inclined to consider the omission of the payment by one of the Debtors to

WSG Management as being an inadvertent omission.  But, the consistent failure to include the

---

[9]  *See* 11 U.S.C. §§ 362(d)(3) (relief from stay in single asset cases), & 101(51B) (definition of "single asset real
estate debtor").

payments by all three Debtors to WSG Management evidences a conscious decision to conceal

the diversion of the funds from the Court and the creditors.

The Court understands Mr. Sheppard's desire not to pay the Lenders' Exit Fees.  Nobody

likes to pay these kinds of fees.  In an effort to gain leverage in the workout negotiations, he

decided to withhold the rents from the secured lenders.  This, in and of itself, is not all that

unusual or objectionable.  But when Mr. Sheppard decided to pay the withheld rents—totaling

$738,484.90—to WSG Management, the Debtors irreversibly crossed into the territory of bad

faith.

The Court finds that there was subjective bad faith in the filing of these bankruptcy cases

arising from: (a) the withholding of the rents from the secured lenders; (b) the payment of over

$700,000 in the secured lenders' collateral to an insider management company; and (c) the

concealment of these payments in the Debtors' initial filings with the Court.

### B.  Objective Futility

The objective futility inquiry is "designed to insure that there is embodied in the petition

'some relation to the statutory objective of resuscitating a financially troubled [debtor].'"

*Carolin Corp.*, 886 F.2d at 701 (quoting *In re Coastal Cable TV, Inc.,* 709 F.2d 762, 765 (1st

Cir. 1983).  Here, there is objective futility.

The Court notes that the Debtors filed their Plan of Reorganization only a few days

before the hearing on the Motions to Dismiss.  The Debtors did not file a Disclosure Statement in

support of the Plan.  *See* 11 U.S.C. §§ 1125 (Postpetition Disclosure and Solicitation), and

1129(a)(2) (in order to be confirmed, the plan must comply "with all applicable provisions of this

title").  The Debtors acknowledged at the hearing on the Motions to Dismiss that the Plan, as

13

currently structured, was not confirmable.  Some of the problems with the Plan may be capable

of correction; others clearly are not.

The Plan divides the secured claims into Primary Lender Claims (Class 2) and Non-

Primary Lender Claims (Class 3).  With respect to the Class 2 Claims, the Debtors propose to

reinstate the secured claims, by paying the amount of the delinquent debt service payments (and

any other damages) on the effective date.  With respect to the Class 3 Claims, the Debtors

propose that these claims will be paid interest at the federal judgment rate, and "payment in full

of the principal balance," either on the fifth anniversary of the effective date of the Plan, or upon

a sale or refinance of the properties.[10]

### 1.  *The Equity Infusions are Ill-Defined*

The Plan depends on certain equity infusions: the Initial Equity Infusion, which will cure

any monetary defaults on the secured obligations, and the Subsequent Equity Infusion, which

will pay the quarterly distributions of interest at the federal judgment rate on the Non-Primary

Class 3 Claims.  The Court was not impressed with the Debtors' evidence on the source and the

amount of either of these equity infusions.  Basically, Mr. Sheppard testified that he and his

partner would put up whatever was needed in the way of equity infusions, in order to

consummate the Plan.  But, there was no written commitment from either Mr. Sheppard or his

partner for these equity infusions.  Neither Mr. Sheppard nor his partner shared their personal

financial statements with the Court.  Even the amount of the Initial Equity Infusion was

undetermined.  In Mr. Sheppard's view, it might have been $500,000 or even $1,000,0000.  In

---

[10]    The secured lenders made the point at the hearing that the Primary Lender Claims and the Non-Primary Lender
Claims are both secured by the same instruments, and the Debtor is in effect seeking to treat the claims as first
priority liens and second priority liens.  This may be a separate classification issue (11 U.S.C. § 1122(a)), or an issue
of unfair discrimination (11 U.S.C. § 1129(b)(1)), for a confirmation hearing.

essence, Mr. Sheppard asks the Court to take it on faith that he and his partner will put in

whatever is needed in order to stave off the secured lender's foreclosure actions.

To be fair, this particular prong—the lack of any cogent evidence on the Equity

Infusions—isn't fatal to the Debtors' attempt to reorganize, and by itself, would not result in

dismissal of these cases.  This kind of evidence could be presented at a confirmation hearing.

However, the lack of evidence on the amount and source of any equity infusions, together with

the other problems with the Debtors' Plan, lead the Court to conclude that the Debtors are not

capable of reorganizing in these cases.

### 2.  *Problems with Section 1.2.63 (the Definition of Non-Primary Lender Claims)*

The definition of the Non-Primary Lender Claims in Section 1.2.63 of the Plan is so

problematic that confirmation would be denied on this basis alone.  The Non-Primary Lender

Claims are those lender claims against the Debtors' properties that secure the debts for WSG W.

Broad (or Short Pump), WSG Snellville, and WSG Monroe.  Plan, Docket No. 97, § 1.2.63.

There are two problems with this definition of the Non-Primary Lender Claims.  First, it omits

the cross-collateralized Atlanta debt, of ATL 2130 (as noted, ATL 2130 is in its own Chapter 11

proceeding in Atlanta).  The Debtors acknowledged that the Plan would have to be amended in

order to include ATL 2130 (again, a non-fatal, required amendment to the Plan).

Second and more importantly, Section 1.2.63 fails to account for the Non-Primary Lender

Claims with respect to each of the three Debtors before this Court, i.e., Dulles, Charlottesville

and Trace Fork.  The Non-Primary Lender Claims with respect to the Dulles, Charlottesville and

Trace Fork properties all are omitted from the definition of the Non-Primary Lender Claims in

Section 1.2.63.  The Debtors, in essence, are seeking to walk away from the cross-

15

collateralization deal that they struck in 2007, simply by omitting Dulles, Charlottesville and

Trace Fork from the definition of Non-Primary Lender Claims in Section 1.2.63 of the Plan.

The Debtors' response to this objection was that, in essence, they are seeking to "de-

accelerate" the cross-collateralized loans with respect to these three properties. But, de-

acceleration or not, these cross-collateralized obligations remain as secured obligations against

the three Debtor properties and can't be "stripped off" by simply defining them out of existence

in the Plan. This is a fatal, non-correctable problem with the Plan.

3. *The Plan's Refusal to Acknowledge the Lenders' Rights to Credit Bid*

The foregoing problem with the definition of Non-Primary Lender Claims leads to

another, equally serious and non-correctable problem with the Plan. Section 5.3 (Class 3) of the

Plan provides that, with respect to the Non-Primary Lender Claims, the Debtors will have the

opportunity to pay "in full" the principal balance on these claims, upon the sale or refinance of

any of the Debtors' properties. Clearly, in a sale of any of the Debtors' properties, the secured

lenders will have the right to credit bid. 11 U.S.C. §§ 1129(b)(2)(A)(ii) & 363(k); *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank,* __ U.S. __, 132 S. Ct. 2065 (2012). The Plan does

not provide for any credit bidding rights by the secured lenders with respect to the Debtors'

properties.

It is possible for the Debtors to amend their Plan, in order to provide for credit bidding

rights of the secured lenders. But, this ignores a more fundamental reality of the posture of these

cases. All of the debts are cross-collateralized. Three of the properties, Short Pump, Snellville

and Monroe, have already been foreclosed. Presumably, there are substantial deficiencies arising

out of the foreclosures on the Short Pump and Monroe properties (putting aside Snellville for the

moment). At this point, the secured lenders have no incentive not to credit bid, and more

importantly, no incentive not to use the substantial deficiencies from the foreclosed properties as

a part of their credit bids on the remaining properties.  With these substantial deficiencies on at

least Short Pump and Monroe in hand, the market value of the Debtors' remaining shopping

centers won't act as a brake on the Lenders' ability to credit bid, should they so choose.[11]

The Debtors suggest that, with respect to the Snellville property, there will be no

deficiency because of the State Court's refusal to approve the foreclosure on that property.  As

noted above, the parties disagree on whether this results in a forgiveness of any deficiency

amount.  Even assuming that there is no deficiency on Snellville, though, this does not address

the deficiencies with respect to the Short Pump and Monroe properties.  The Debtors argued that

they had "questions" concerning the deficiencies on Short Pump and Monroe, but other than

questioning the amounts, the Debtors never set forth a legal argument for why there will be no

deficiencies on these properties.

Given: (a) the cross-collateralization of all of the secured debt; (b) the foreclosures on

three of the properties; and (c) the likelihood of deficiency amounts on at least two of the three

---

[11]   The Deeds of Trust provide that the obligations are essentially "non-recourse."  *See* Deed of Trust, Movants'
Exs. 1-3, § 13.1.  This non-recourse provision is subject to two limitations.  First, Bankruptcy Code Section
1111(b)(1)(A) provides:

A claim secured by a lien on property of the estate shall be allowed or disallowed under Section 502 of this
title the same as if the holder of such claim had recourse against the debtor on account of such claim,
whether or not such holder has such recourse, unless (i) the class of which such claim is a part elects by at
least two thirds in amount and more than half in number of allowed claims of such class, application of
paragraph (2) of this subsection; or (ii) such holder does not have recourse and such property is sold under
section 363 of this title or is to be sold under the plan.

Thus, the Debtors arguably could avoid the effect of the Section 1111(b)(1)(A) imposition of recourse liability with
respect to otherwise non-recourse debt, by a sale under Section 363 or a sale pursuant to the terms of a confirmed
plan.  The Debtors could *not*, however, avoid the imposition of recourse liability under Section 1111(b)(1)(A) by a
refinance of any of the properties, as suggested by Section 5.3 of the Plan.

Second, Section 13.4 of the Deeds of Trust provide that the non-recourse language "SHALL BECOME
NULL AND VOID" (emphasis in original) in the event that "the Property or any part thereof shall become an asset
in . . . a voluntary bankruptcy or insolvency proceeding."  The Court, therefore, must consider the potential for
deficiency claims arising from the three foreclosures, notwithstanding the non-recourse language of Section 13.1 of
the Deeds of Trust.

foreclosed properties; then Section 5.3 of the Plan just doesn't work.  This is not because it doesn't *say* that the secured lenders have credit bidding rights; this could be fixed with an amendment.  It's because, in reality, the sales or refinancing of the three Debtor properties could *never* be achieved over the secured lenders' credit bidding rights on the Non-Primary Lender Claims, owing to the deficiency amounts on the foreclosed properties.  This is not a matter than can be remedied by an amendment to the Plan.

   4.  *The Debtors' Inability to Gain an Acceptance from an Impaired,*
       *Non-Insider Class of Claims*

Finally, the Debtors clarified at the hearing that, pursuant to 11 U.S.C. § 506(a), the Class 3 Non-Primary Lender Claims will have to be bifurcated into the secured portions of the claims (if any) and the unsecured portions of the claim.  The latter, the unsecured deficiency claims (including those for the three Debtors themselves, Dulles, Charlottesville and Trace Fork), will be treated as Class 4 Unsecured Claims under Section 5.4 of the Plan.

Owing to the cross-collateralization of all of the debts, there will be substantial amounts in Unsecured Class 4 Claims for the Non-Primary Lender Claims, amounts that will dwarf the other unsecured claims in each of the cases.  The Lenders have no intention of voting in favor of the Plan, and have every intention to vote against it.  Thus, the Debtors will not have an impaired accepting class, and cannot get to confirmation of the Plan.  11 U.S.C. § 1129(a)(10).  Class 1 is not entitled to vote.  Classes 2 and 3 are the secured lenders' claims.  Class 4 will be dominated by the secured lenders' deficiency claims.  Class 5 consists solely of insiders.  Class 6, the Tabas Claims, will be withdrawn.  Class 7 consists of equity interests which, again, are held solely by the insiders (and are junior, in any event, to the Class 4 Unsecured Claims).  This is a fatal flaw, one not capable of being remedied by an amendment to the Plan.

For these reasons, the Court finds that there is an objective futility to the Debtors' ability to reorganize in Chapter 11.

### C.  The Debtors' Argument Concerning the Allegedly Defective Notices of Default

After the hearing on the Motions to Dismiss, the Debtors filed a Supplemental Memorandum.  Docket No. 111.  The Lenders filed a Response in opposition.  Docket No. 113. In their Supplemental Memorandum, the Debtors assert that the notices of default sent to each of the seven Borrowers (Dulles, Charlottesville, Trace Fork, ATL 2130, Monroe, Short Pump and Snellville) were defective because the notices were not copied to the Borrowers' counsel, the Berman Rennart firm in Miami.

Paragraph 18 of the Note provides that

[A]ll notices or other written communication hereunder shall be deemed to have been properly given . . .

If to Borrower:          Borrower
                         c/o WSG Development Company
                         400 Arthur Godfrey Road, Suite 200
                         Miami Beach, Florida 33140
                         Attention: Jeffrey Graff

With a copy to:          Berman Rennert Vogel & Mandler
                         100 S.E. 2nd Avenue, 2900 Floor
                         Miami, Florida 33131
                         Attention: Wendy Beck, Esq.[12]

Section 3(a) of the Note provides in part:

The whole of the principal sum of this Note . . . shall *without notice* become immediately due and payable at the option of Lender if any payment required in this Note prior to the Maturity Date is not paid on the date when due or on the happening of any other default, after the expiration of any applicable notice and grace periods herein or under the terms of the Security Instrument or any of the other Loan Documents (collectively, and "Event of Default").  (Emphasis added.)

---

[12] Section 14.1 of the Deed of Trust provides a nearly identical notice provision.

Section 11 of the Note provides:

Borrower and all others who may become liable for the payment of all or any part of the
Debt do hereby severally *waive* presentment and *demand for payment*, notice of dishonor,
protest and *notice of protest and non-payment* and all other notices of any kind, other
than notices specifically required by the terms of this Note, the Security Instrument and
the other Loan Documents.  (Emphasis added).

Section 9.1 of the Deed of Trust defines the term "Event of Default" as:

The occurrence of any one or more of the following events . . . : (a) if any portion of the
Debt is not paid on the date the same is due or if the entire Debt is not paid on or before
the Maturity Date . . . (m) if for more than ten (10) days after notice from Lender,
Borrower shall continue to be in default *under any other term*, covenant or condition of
the Note, this Security Instrument or the other Loan Documents in the case of any default
which can be cured by the payment of a sum of money or for thirty (30) days after notice
from Lender in the case of any other default . . . (Emphasis added).

There are a number of events of default that do in fact require written notice from the

Lender.  *See, e.g.*, Deed of Trust, ¶¶ 9.1(c) (failure of Borrower to keep the property insured

"beyond five (5) days after Lender delivers notice of Borrower's failure to Borrower") & 9.1(j)

("if within ten (10) days of Lender's demand therefor," Borrower fails to provide an ERISA

compliance certificate or to provide Lender with documents in connection with a transfer of the

Loan).  A failure to pay a debt service payment is clearly an Event of Default that can be cured

by the payment of money, and therefore, arguably within the ambit of the Section 9.1(m)

provision requiring ten (10) days' written notice of default.  However, this would be facially

inconsistent with Section 9.1(a) which by its terms does not require notice of an Event of Default

where that Event of Default is the failure to pay a loan payment.  Further, if Section 9.1(m) were

read to include a payment default, then the term "any other" (that is, other than the defaults

identified in the preceding sections, including Section 9.1(a)) would be rendered superfluous.[13]

---

[13]   The Debtors argue that the more specific language should control over the general.  Debtors' Supplemental
Mem., n.6.  The Court agrees, but the Court finds that the more specific provision is Section 9.1(a) controls over the

For these reasons, the Court finds that a written notice of a payment default was not required, and therefore, notice to counsel of the default was not required under the terms of the Loan Documents.  There simply is no provision of the Note or the Deed of Trust that requires a notice of a payment default.  Sections 3(a) and 11 of the Note waive notice of default as to a payment default.

Even if notices of the payment default were required, the Court does not see how that can, or should, affect the outcome here.  The issues are: (a) whether the cases were filed in subjective bad faith; and (b) objectively viewed, whether the Debtors have a shot at a reorganization.  Debtors can object to creditors' claims to the extent that such claims are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. § 502(b)(1).  The effect of this Code provision is that the Debtors retain all defenses to payment that they had on the day that the bankruptcy cases were filed, *other than* the defense that the claim is contingent or unmatured.  *In re Solutia, Inc.*, 379 B.R. 473, 485 (Bankr. S.D. N.Y. 2007) ("A claim is allowable under Code § 502(b)(1) even though it is unmatured.  Acceleration by the mortgagee is not necessary to render the claim allowable.  Here, acceleration actually occurred automatically on the Petition Date and the 2009 Notes were no longer unmatured.")  The practical effect is that, on the date that the cases were filed, all of the debts were accelerated, whether or not notice was required or given in accordance with the Loan Documents.

---

more general, catch-all provision of Section 9.1(m).  The Court also rejects the argument that the terms of Sections 9.1(a) and (m) are ambiguous; they aren't.  They can be read together without conflict to provide that a notice of a payment default is not required.  Only the Debtors' reading of the two provisions creates an ambiguity, something the Court should strive to avoid.

For the foregoing reasons, the Court rejects the argument raised by the Debtors in their

Supplemental Memorandum that the notices of default were defective, or if they were, that the

alleged defect has any bearing on the outcome of these Motions.

## II.     The Lenders' Request, in the Alternative, for Relief from the Automatic Stay

Finally, in the interest of completeness, the Court addresses the Lenders' request for

alternative relief.  The Lenders request that, if the Court were to deny the Motions to Dismiss,

that the Court grant them relief from the automatic stay under Section 362(d) of the Code.  The

Court finds that the request for relief from the automatic stay is moot, in light of the above

disposition of the Motions to Dismiss.

Absent a dismissal of these cases, though, the Court would grant relief from the

automatic stay.  Under Section 362(d)(2), the Court is required to grant relief if there is no equity

in the property, and the property is not necessary for an effective reorganization.  It is the

Lenders' burden to prove that there is no equity in the property.  Once the Lenders prove that

there is no equity in the property, then it is the Debtors' burden to prove that the properties are

necessary for an effective reorganization.  11 U.S.C. § 362(g)(1)-(2).  By the term "effective

reorganization," Congress meant an effective reorganization "that is in prospect."  *United Sav.*

*Ass'n of Tex. v. Timbers of Inwood Forest, Ltd*., 484 U.S. 365, 375-76 (1988).  This means that

the Debtors must show that there is "a reasonable possibility of a successful reorganization

within a reasonable time."  *Id.*

Here, the Lenders have met their burden to show that there is no equity in any of the

Debtors' three properties (Dulles, Charlottesville, or Trace Fork).  Given the values (*see supra*

Findings of Fact ¶ 17), there is simply no way for the Debtors to overcome the fact that the cross-

collateralization of the seven Borrower obligations leads inexorably to the conclusion that there

22

is no equity in the three Debtor properties.  The Debtors have failed to show that there is an

overall enterprise value here that has equity over and above the cross-collateralized debts.  This

is not surprising.  Snellville, Monroe and Short Pump, having been foreclosed, can hardly add

any value to the enterprise.  ATL 2150 is in bankruptcy.

Finally, the Debtors have not met their burden to show that there is an effective

reorganization that is in prospect here.  To the contrary, as the Court found in Part I above, the

possibility of a reorganization is more than remote, it is well-nigh impossible.

Absent a dismissal of these cases, the Court would be compelled to grant relief from the

automatic stay under Section 362(d)(2) of the Code.

### Conclusion

The Court finds that: (a) these cases were filed in subjective bad faith; and (b) a

reorganization of these Debtors under these circumstances would be an exercise in objective

futility.  The Court will enter a separate Order dismissing these cases.  The Order will be a

dismissal with prejudice for a period of 180 days, in order to enable the secured lenders to

exercise their foreclosure rights under applicable non-bankruptcy law.

Finally, the Court will deny the Lenders' request for alternative relief, in the form of

relief from the automatic stay, as moot.


Date: _____          _____
                                        Brian F. Kenney
Alexandria, Virginia                    United States Bankruptcy Judge

Copies to:

Lawrence Allen Katz, Esquire
Leach Travell Britt PC
8270 Greensboro Drive, Suite 1050
McLean, VA 22102
Counsel to the Debtors

Joseph A. Guzinski, Esquire
Office of the United States Trustee
115 South Union Street, Room 210
Alexandria, VA 22314

John H. Maddock III, Esquire
McGuireWoods LLP
901 East Cary Street
Richmond, Virginia 23219-4030
Counsel for Creditors